# In the United States Court of Federal Claims

No. 17-1752C (BID PROTEST)
(Filed Under Seal: May 4, 2018 | Reissued: May 16, 2018)*

| | |
|---|---|
| SENTER, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Keywords: Post-Award Bid Protest; Small Business Administration; Unpopulated Joint Venture; 13 C.F.R. § 121.103(h). |

*R. Thomas Dawe*, Gallagher, Casados & Mann, P.C., Albuquerque, NM, for Plaintiff.

*Alexis J. Echols*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant. *Beverly E. Hazelwood*, Trial Attorney, Office of General Counsel, U.S. Small Business Administration, Washington, D.C., and *William H. Butterfield*, Office of General Counsel, U.S. Coast Guard, Washington, D.C., Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff Senter, LLC (Senter), a joint venture, filed this post-award bid protest to challenge the Small Business Administration's (SBA) determination that it was ineligible to obtain a set-aside contract to provide certain services to the United States Coast Guard. As discussed in detail below, the SBA found that Senter failed to show that it was an unpopulated joint venture within the meaning of the SBA's regulations, as it must be in order to receive a set-aside contract. Senter argues that this determination was arbitrary, capricious, and contrary to law. The parties have filed cross-motions for judgment on the administrative record. As discussed below, the Court concludes that the SBA's determination had a rational basis in the record. Accordingly, Senter's motion for

---

* This Opinion and Order was originally issued under seal, and the parties were given the opportunity to request redactions. Neither party requested redactions, and the Court is now reissuing the Opinion and Order in full.

judgment on the administrative record is **DENIED** and the government's cross-motion for judgment on the administrative record is **GRANTED**.

## BACKGROUND

### I. Relevant SBA Regulations Regarding Joint Ventures

In accordance with the Small Business Act, the SBA is charged with promulgating "detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act." 15 U.S.C. § 632(a)(2)(A) (2012). Pursuant to this statutory authority, the SBA has issued regulations that "define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns." 13 C.F.R. § 121.101(a) (2017).

As relevant here, the SBA's regulations include detailed specifications regarding the circumstances in which a joint venture (JV) may be awarded a set-aside contract. See id. § 124.513; see also id. § 125.8 (describing the requirements a joint venture must satisfy to submit an offer on a set-aside procurement); id. § 121.103(h) (describing the circumstances in which the SBA considers JV partners to be affiliated for purposes of determining size).

One of these requirements prohibits the JV entity itself from employing the "individuals intended to perform contracts awarded to the joint venture."[1] Id. § 121.103(h). Therefore, for a JV to be eligible for a set-aside contract, the employees performing substantive work on the contract must be employed by the JV's members, not the JV entity.[2] See id. Such a JV is considered "unpopulated" under the regulations. Id. By contrast, a "populated" JV has "its own separate employees to perform contracts awarded to the joint venture." Id. Populated JVs are not eligible for set-aside awards. See id.

This requirement is of recent vintage, having been promulgated on July 25, 2016. See Small Business Mentor Protégé Programs, 81 Fed. Reg. 48,558, 48,578 (July 25, 2016). Id. It went into effect on August 24, 2016. Id. at 48,558.

### II. The Procurement at Issue

#### A. The Solicitation

On July 21, 2017, the Coast Guard issued solicitation HSCG23-17-R-MCM022, a request for proposals (RFP) seeking a contractor to provide "support services" at Coast

---

[1] This requirement applies only when the JV "exist[s] as a separate limited liability company or other separate legal entity." See 13 C.F.R. § 121.103(h).

[2] The regulations do permit a JV to "have its own separate employees to perform administrative functions." 13 C.F.R. § 121.103(h).

Guard headquarters. Admin. R. (AR) Tab 16 at 313. These services would include (among other things) "analysis, design, development, evaluation[,] and implementation services for performance improvement products for the U.S. Coast Guard (USCG) Office of Cutter Forces (CG-751)." Id. The RFP contemplated the award of an Indefinite Delivery Indefinite Quantity (IDIQ) contract with a one-year base period and four one-year option periods. Id. at 313–14; see also id. at 231, 236. The contract was set aside for section 8(a) small businesses as approved by the SBA. See id. at 313 ("This requirement is covered under FAR 19.805 Competitive 8(a)."). Senter was the incumbent contractor for the RFP. See id. Tab 27 at 786.

### B. Senter's Pre-Proposal Communications with the SBA

#### 1. The April 7, 2016 Proposed Joint Venture Agreement

On April 7, 2016, one of Senter's members, Sylvain Analytics, Inc. (Sylvain), sent a letter to the SBA titled "Letter of Request for Joint Venture."[3] Id. Tab 38 at 878. At this point, the SBA's D.C. office was apparently responsible for processing Sylvain's request. See id. Tab 35A at 836. Sylvain would be the JV's lone 8(a)-approved member. See id. Tab 42 at 906.

The letter included, for the SBA's "review and approval," a copy of Senter's proposed joint venture agreement (hereinafter, the "proposed JV agreement"). Id. Tab 38 at 878; see also id. Tab 47 (copy of the proposed JV agreement). The proposed JV agreement stated that the Senter JV would have two members: Sylvain, owning 51% of the JV, and Entereza, Inc. (Entereza), owning the remaining 49%. Id. Tab 47 at 1002. In a section titled "Purpose," the proposed JV agreement described Senter as a "populated Joint Venture limited liability company" that would "be populated with its own employees." Id. at 1001. Further, it noted that "[t]he purpose of this populated Joint Venture" was " to bid upon [an] anticipated solicitation . . . for follow-on work to [the] current prime contract" held by Senter. Id.

In a section titled "Contract Performance," the proposed JV agreement also noted that "[t]he staffing under this populated joint venture will be maintained by the joint venture company, Senter, LLC." Id. at 1003. Under this arrangement, the "Managing Venturer [Sylvain] w[ould] gain experience in managing a company," while the "Partner Venturer[] [Entereza] w[ould] perform business development assistance services to the Managing Venturer." Id. (emphasis omitted).

#### 2. The August 29, 2016 Revised JV Agreement

Between April 2016 and July 2016, several individuals in the SBA's D.C. office reviewed the proposed JV agreement. See id. Tab 38 at 874–77 (review checklists). The

---

[3] The letter is dated March 24, 2016, but was apparently signed on April 7, 2016. See AR Tab 38 at 878.

reviewers's remarks indicated that the proposed JV was considered a populated one. See id. at 874–75.

On August 29, 2016, Sylvain submitted a revised JV agreement for the SBA's review (hereinafter, the "revised JV agreement"). See id. Tab 34 at 832–35; see also Def.'s Cross-Mot. for J. Upon the Admin. R. & Resp. to Pl.'s Mot. for J. Upon the Admin R. (Def.'s Mot.) at 5, ECF No. 28 (observing that "[o]ver the course of the SBA review, including discussions with the SBA, Senter submitted several iterations of the joint venture agreement").

In the revised JV agreement, the "Purpose" section had been changed to state that the JV would "be unpopulated with its own employees." AR Tab 34 at 832. Likewise, in the "Contract Performance" section, the revised agreement stated that "[t]he staffing under this unpopulated joint venture will be maintained by the joint venture company, Senter, LLC."[4] Id. at 834. As in the proposed JV agreement, however, the "Contract Performance" section continued to state that the "Managing Venturer [Sylvain] w[ould] gain experience managing a company," while the "Partner Venturer[] [Entereza] w[ould] perform business development assistance services to the Managing Venturer." Id. (emphasis omitted).

### 3. The August 31, 2016 Approved JV Agreement

Sylvain subsequently submitted another updated JV agreement on August 31, 2016 (hereinafter, the "approved JV agreement"), which contained further changes regarding whether Senter was populated or unpopulated. Id. Tab 33 at 824–31. Thus, the "Purpose" section of the approved JV agreement described Senter simply as an "unpopulated Joint Venture limited liability company," and no longer mentioned the source of Senter's employees. Id. at 824.

Further, in the "Contract Performance" section, the approved JV agreement dispensed with the general discussion of the members' roles and included new language stating that "51 percent of the work will be done through [Sylvain] and 49 percent of the work will be done through Entereza." Id. at 826. Further, it specifically noted that Sylvain would "provide the Project Manager, the Systems Architect[,] and the Software Developer," while Entereza would "provide the Instructional Designer and the Curriculum Developer." Id.

On the other hand, as with the proposed JV agreement (but not the revised JV agreement), the Contract Performance section of the approved JV agreement also included a sentence stating that "[t]he staffing under this populated joint venture will be maintained by the joint venture company, Senter, LLC." Id. (emphasis added).

---

[4] The Court notes that these changes appear to indicate some confusion regarding the meaning of the term "unpopulated" in this context.

### C. The SBA's Approval of the August 31, 2016 Agreement

On September 1, 2016, a Business Opportunity Specialist at the SBA, Elsie Price, issued a memorandum recommending approval of the August 31, 2016 JV agreement. See id. Tab 38 at 880–83; see also Def.'s Mot. at 6 (observing that the "SBA issued its approval of Senter's final joint venture agreement" on September 1, 2016). The memorandum focused almost entirely on Sylvain's and Entereza's sizes, and did not mention the JV's status as populated or unpopulated. See AR Tab 38 at 880–82. Some time thereafter, District Director Antonio Doss advised Sylvain that its request to "enter into" a JV had "been approved." Id. at 879.

Several months later, on April 7, 2017, Sylvain apparently relocated, and the SBA's Richmond, Virginia office became responsible for administering its file. See id. Tab 35A at 836.

### D. Senter's Proposal and the SBA's Eligibility Determination

#### 1. Initial Review and the SBA's Request for an Addendum

Senter submitted its initial proposal to the Coast Guard on August 18, 2017. Id. Tab 24 at 608. After receiving proposals, the Coast Guard amended the RFP. Id. Tab 21 at 516. Senter then submitted a revised proposal on September 8, 2017. Id. Tab 25 at 764.

A few days later, on September 14, 2017, the Coast Guard requested an eligibility determination from the SBA regarding Senter, which the Coast Guard had determined was the apparent successful offeror. Id. Tab 35A at 836. Upon review, the SBA determined that Senter had not filed a necessary addendum to its JV agreement. Id. Tab 43 at 942; see also id. Tab 35A at 836. Specifically, the SBA found that because the Coast Guard contract would be the second contract awarded to Senter, Senter was required under 13 C.F.R. § 124.513(e) to file an addendum "setting forth the performance requirements on that second . . . contract." See id. Tab 43 at 942 (quoting 13 C.F.R. § 124.513(e)(2)).

Accordingly, on September 20, 2017, an SBA Business Opportunity Specialist, Igor Soares, sent an email to Sylvain's principal, Ray Sylvain, informing him of the SBA's conclusions and stating that "[i]f you choose to send [an addendum] prior to award date, SBA does not guarantee that it will be processed in time." Id.

Mr. Soares attached a "JV Addendum District Office Checklist" to the email. Id. at 943–45 (capitalization altered). The checklist included several boilerplate provisions with brackets indicating information Senter needed to provide. See id. One of these provisions read as follows:

> The joint venture addendum is an UNPOPULATED SEPARATE ENTITY JOINT VENTURE as was certified to SBA by [*Name of JV, 8(a) firm and JV Partner*]

Id. at 944.

Further, the JV Addendum Checklist instructed Senter to state that it had "amend[ed] and revise[ed]" its JV agreement in several specified ways. Id. As relevant here, the checklist instructed Senter make the following changes:

1. Under Section 1, the paragraph titled "Purpose of the Joint Venture" shall read as follows: (*insert paragraph from Joint Venture Agreement*)

. . .

3. Paragraph 9 "Performance of Work" shall read as follows: (*insert paragraph from Joint Venture Agreement*)

"The work share of the Joint Venture member will be split in the following manner:

| 8(a) Firm | % of work share |
|---|---|
| JV Partner | % of work share |

Id.

### 2. Senter's Draft Addendum

Mr. Sylvain apparently drafted an addendum on Senter's behalf and delivered it to the SBA that same day. See id. Tab 32 at 822–23 (addendum with digital signature dated September 20, 2017).

In line with the JV Addendum Checklist, the addendum included the boilerplate sentence stating that "[t]he joint venture addendum is an UNPOPULATED SEPARATE ENTITY JOINT VENTURE as was certified to SBA by Senter, LLC, Sylvain Analytics, Inc., and Entereza, LLC." Id. at 822.

In the "Purpose" portion of the addendum, however, Senter did not insert the language that had appeared in the purpose section of the approved JV agreement, which had stated that Senter was unpopulated. Rather, it inserted the language that had appeared in the proposed JV agreement—i.e., the agreement submitted in April 2016—which included two references to Senter as populated. Thus, in the addendum, Senter stated that "[t]he joint venture will be a limited liability company (LLC), and will be populated with its own employees," and that "[t]he purpose of this populated Joint Venture limited liability company is to bid upon [an] anticipated solicitation." Id. (emphasis added); see also id. Tab 47 at 1001 (proposed JV agreement with the same language).

As to the "Performance of Work" portion of the addendum, Senter included language nearly identical to that found in the "Ensured Performance" section of both its proposed and approved JV agreements, and added the following table:

"The work share of the Joint Venture member will be split in the following manner:

| 8(a) Firm | 51% of work share |
|---|---|
| JV Partner | 49% of work share |

Id. Tab 32 at 823; see also id. Tab 47 at 1003.

### 3. The SBA's Review of the Draft Addendum and Senter's Revised Addendum

Mr. Soares reviewed the draft addendum and replied to Mr. Sylvain on September 21, 2017. Id. Tab 43 at 976. He stated that he had "found some issues" with the addendum that Mr. Sylvain needed to correct, and noted that he had attached a copy of the addendum with his notes on it to "facilitate editing." Id. First, "[o]n paragraph 1," he asked Mr. Sylvain to "please state the 'need' for this JV." Id. Second, "[o]n paragraph 2," he noted that Mr. Sylvain should "delete [the] highlighted line."[5] Id. Third, "[o]n paragraph 3," he requested that Mr. Sylvain "expand on the source of labor, what exactly are you going to perform." Id.

Later that day, Mr. Sylvain sent Mr. Soares an updated addendum.[6] See id. at 975–76. Mr. Soares reviewed it and quickly replied to Mr. Sylvain, informing him that "[b]y 'need' I mean a needs statement; why can['t] you perform this on your own? Why is it necessary to bring in a partner to perform the tasks listed on the requirement? One or two lines should suffice." Id. at 975. Mr. Sylvain then replied with another version of the addendum, stating that he had "added the reason for keeping Entereza on the team as requested," and that he "hope[d] [the] 3rd time is a charm." Id.

The record appears to include a copy of this second revised addendum (hereinafter, the "revised addendum").[7] Id. at 978–79. Notably, like the draft addendum and the proposed JV agreement, the "Purpose" section of the revised addendum described

[5] Although the attachment to Mr. Soares's email does not appear to be included in this portion of the administrative record, in the copy of the addendum found at Tab 32 of the record, the line reading "[t]he joint venture will be a limited liability company (LLC) and will be populated with its own employees" is highlighted. See AR Tab 32 at 822.

[6] This version of the addendum does not appear to have been included in the record.

[7] Although the revised addendum is dated September 20, 2017, it includes an electronic signature from Mr. Sylvain that is timestamped September 21, 2017, at "21:56:03 + 02'00'." AR Tab 43 at 979.

Senter as "a limited liability company (LLC) [that] will be populated with its own employees." Id. at 978. It further stated that "[t]he purpose of this populated Joint Venture . . . is to bid upon [the] solicitation" involved in this case. Id.

In addition to this language, the revised addendum's "Purpose" section included representations that "Entereza brings strong Instructional Design knowledge pertaining to this client" and that "this team brings strong cohesion and collaborative pedigree benefiting this client." Id.

Further, the revised addendum's "Performance of Work" section included a new sentence describing the "resources" that Sylvain, the 8(a) firm, would "provide." Id. at 979. These include "Project Management," "Software Developer," "Quality Assurance," and "Instructional Designer." Id. This list resembles, but does not mirror, the list found in the "Contract Performance" section of the approved JV agreement, where Senter specified which JV member would provide certain employees on the contract. See id. Tab 33 at 826.

**4. The SBA's Denial**

The next day, September 22, 2017, Mr. Soares issued a denial letter informing Senter that it was ineligible to receive the contract. Id. Tab 35C at 839. Mr. Soares explained that the SBA had "reviewed the . . . [a]ddendum dated September 20, 2017[,] which amend[ed] the Joint Venture Agreement of SYL-Entereza dba Senter, LLC"—i.e., the approved JV agreement.[8] Id. Mr. Soares found that "the Joint Venture Agreement, as amended by the . . . [a]ddendum, does not meet the requirement of 13 CFR § 124.513 for program eligibility." Id. (emphasis omitted).

Mr. Soares observed that "[t]he [a]ddendum appear[ed] to certify that an Unpopulated separate entity joint venture was approved by SBA." Id. "However," he continued, "after initial review, SBA found no evidence." Id. According to Mr. Soares, "[t]he initial joint venture approved by SBA on September 1, 2016 was Populated, and a new joint venture was not tendered." Id. Further, he determined that "the [a]ddendum . . . did not adequately describe the sub-contracting vehicle that will split performance between the entity members." Id. And he noted that "[a]s an unpopulated joint venture there should be no employees from . . . Senter, LLC." Id.

Having described these facts and determinations, Mr. Soares concluded that "[d]ue to discrepancies and lack of supporting documents . . . Addendum 1 to JV Agreement of SYL-Entereza dba Senter, LLC by and between Sylvain Analytics, Inc., and Entereza, LLC is not legally sufficient." Id. (emphasis in original). That same day, the SBA notified the Coast Guard that Senter was ineligible for the award. Id. Tab 27 at

---

[8] As noted, although the revised addendum was dated September 20, 2017, it was electronically signed on September 21, 2017. See supra n.7. Thus, the Court presumes that Mr. Soares was referring to the revised addendum throughout the denial letter.

800. The Coast Guard accordingly issued the award to the second-in-line offeror. See id.; see also id. Tab 29 (award notice).

**E. Post-Denial Actions**

After the SBA issued the denial letter, on September 28, 2017, Entereza's president, Virginia Buckmelter, contacted the SBA to express her belief that Senter was, in fact, an approved, unpopulated JV. See id. Tab 42 at 921. In support, she cited the amended JV agreement dated August 29, 2016 (which, as described above, was not the version that the SBA ultimately approved). Id. According to the SBA's notes, Ms. Buckmelter also indicated that she believed Senter was "grandfathered into the old regulation." Id. (quotation omitted). The SBA then held a conference call with representatives from Sylvain and Entereza on October 5, 2017, but it did not change its position after this discussion. See id.

A week later, on October 12, 2017, the Deputy District Director of the SBA's Richmond office, Shirelle Taliaferro, emailed Pamela Mannion, a Supervisory Business Opportunity Specialist in the D.C. office, to request information about Senter. Id. Tab 39 at 885. Ms. Taliaferro noted that the Richmond office had "recently disapproved an offer letter for [Senter's] JV because the one we had in the file was populated." Id. Senter's position, however, was that "they had a[n] unpopulated JVA approved by the DC office." Id. That same day, October 12, 2017, Ms. Mannion informed Ms. Taliaferro that she "ha[d] a[n] unpopulated joint venture for [Senter]." Id. at 884.

At around this same time, on October 11, 2017, Ms. Buckmelter contacted the SBA's ombudsman to request a "review [of] the actions that le[d] up to the SBA informing the United States Coast Guard that Senter, LLC was a populated Joint Venture (JV) and was, therefore, ineligible for [the] contract award." Id. Tab 45B at 999; see also id. Tab 45A. She claimed that, to the contrary, "Senter is an unpopulated JV, as amended on 8/29/2016, and approved by the SBA on 09/01/2016 and was indeed eligible for the . . . contract award." Id. Tab 45B at 999. On the same day, Ms. Buckmelter sent a similarly worded email to Senator Martin Heinrich of New Mexico, whose office then initiated a congressional inquiry to which the SBA was required to respond. See id. Tabs 44A–B.

Soon thereafter, in a November 16, 2017 Memo to File, the Richmond office detailed the reasoning behind its denial decision. Id. Tab 42 at 906. According to the memo, when reviewing the addendum, the SBA "discovered discrepancies between the original Joint Venture Agreement and [the] Addendum." Id. These discrepancies included "[n]o wet signatures or electronic signatures by both members"; "[n]ature of work performance by employees wasn't specific"; and "[c]ontrol issues lodged in favor of non-disadvantaged incumbent." Id.

The memo also noted that "[t]he approved JV . . . still had elements of a populated agreement." Id. Further, according to the memo, "despite the label of being unpopulated," the addendum "still followed the populated framework for work performance." Id. Having made these observations, the memo concluded by noting that

"[i]t is unclear as to what Sylvain Analytics, Inc. brings to the joint venture other than its 8(a) status." Id.

## III. This Action

Senter filed its complaint in this Court on November 8, 2017. ECF No. 1. It alleges that it "established with documentation that it was an un-populated joint venture," and that the SBA consequently erred when it determined that it was ineligible for the award. Id. ¶¶ 9, 13, 16.

Following a status conference, the government compiled and filed the administrative record. ECF No. 14. Senter then filed a motion for judgment on the administrative record on February 5, 2018. ECF No. 24. The government filed a cross-motion for judgment on the administrative record on March 8, 2018. ECF No. 28. The Court heard oral argument on April 24, 2018.

# DISCUSSION

## I. Jurisdiction

The Court of Federal Claims' bid protest jurisdiction is defined by 28 U.S.C. § 1491(b)(1). That statute grants the Court jurisdiction to "render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Id. As the Federal Circuit has observed, "[o]n its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement." Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012).

As indicated by the statute, a plaintiff must be an "interested party" to have standing to invoke the Court's bid protest jurisdiction. CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002). According to the Federal Circuit, an "interested party" under 28 U.S.C. § 1491(b)(1) is "an actual or prospective bidder . . . whose direct economic interest would be affected by the award of the contract." CGI Fed., 779 F.3d at 1348 (quoting Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1299 (Fed. Cir. 2001)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). An offeror has a direct economic interest if the alleged errors in the procurement caused it to suffer a competitive injury or prejudice. Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (holding that "prejudice (or injury) is a necessary element of standing").

It is well established that an SBA decision on an offeror's eligibility for a set-aside contract is a decision made "in connection with" a procurement. Dorado Servs., Inc. v. United States, 128 Fed. Cl. 375, 383–85 (2016); RCD Cleaning Serv., Inc. v. United States, 97 Fed. Cl. 582, 588 (2011); Mission Critical Sols. v. United States, 96 Fed. Cl. 657, 661 (2011); see also Sys. Applications & Techs., Inc., 691 F.3d at 1381 (observing

that "a narrow application of section 1491(b)(1) does not comport with the statute's broad grant of jurisdiction over objections to the procurement process"); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (describing the text of the jurisdictional grant as "very sweeping in scope"). And because Senter was the apparent successful offeror before the SBA determined that it was ineligible for the award, it clearly has a direct economic interest in the contract award. It therefore has standing to bring this bid protest.

## II. The Merits of the Parties' Cross-Motions for Judgment on the Administrative Record

### A. Standard for Granting Judgment on the Administrative Record

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the [c]ourt must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007), aff'd, 285 F. App'x 746 (Fed. Cir. 2008). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

### B. Standard of Review in Bid Protest Cases

The court reviews challenges to a procurement decision under the same standards used to evaluate an agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351. This "highly deferential" standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest action, the protester "bears a heavy burden" in attempting to show that [the] agency's decision lacked a rational basis, and the court's function is limited to "determin[ing] whether 'the . . . agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33, 1338 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, to prevail, the agency need only articulate a "rational connection between the facts found and the choice made";

and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotations omitted).

### C. Application to This Case

When bidding on a set-aside contract, the offeror must demonstrate to the SBA that it is eligible to receive the contract. See Dorado, 128 Fed. Cl. at 385–86; RCD Cleaning, 97 Fed. Cl. at 588; Mission Critical Sols., 96 Fed. Cl. at 663–64; see also FAR 19.805-2(b)(1) ("In either negotiated or sealed bid competitive 8(a) acquisitions[,] SBA will determine the eligibility of the apparent successful offeror and advise the contracting office . . . after receipt of the contracting office's request for an eligibility determination."). Here, the Court concludes that the SBA's determination that Senter failed to demonstrate its eligibility had a rational basis in the record.

First, it is clear from the record that the documents Senter submitted to the SBA contained a dizzying array of inconsistencies and ambiguities pertinent to its status as populated or unpopulated. Thus, as discussed, the approved JV agreement described Senter as populated in the "Contract Performance" section but as unpopulated in the "Purpose" section. See AR Tab 33 at 824, 826. Further, although the agreement's "Contract Performance" section specified which JV member would supply certain employees, there is no indication that it listed all the employees who would perform substantive work on the contract, leaving open the possibility that the JV itself might employ some individuals who would perform substantive work.[9] See id. at 826.

Far from offering clarity, the revised addendum compounded the confusion. In particular, the addendum's "Purpose" section twice described Senter as populated, despite Mr. Soares's direct instruction to take out a line referring to Senter as populated. See id. Tab 43 at 976, 978; id. Tab 32 at 822. And because the addendum "amend[ed] and revise[d]" the agreement, these changes also had the effect of removing the agreement's sole express reference to Senter as unpopulated. Id. Tab 43 at 978.

The addendum's "Performance of Work" section further muddied the waters. As noted, the approved JV agreement traced the sourcing of five employees who would perform substantive work on the contract: the Project Manager, the Systems Architect, and the Software Developer (from Sylvain); and the Instructional Designer and the Curriculum Developer (from Entereza). Id. Tab 33 at 826. But the revised addendum

[9] Further, as the government points out, the approved JV agreement's representation that Sylvain would provide the Project Manager ultimately was not born out in Senter's proposal. See AR Tab 24 at 650, 654 (proposing Entereza's Dr. Barbra Portzline as the Project Manager). In the revised addendum, Senter tweaked the "Contract Performance" section's language slightly, stating that Sylvain would provide "Project Management" rather than the Project Manager. See id. Tab 43 at 979. Nonetheless, the Court notes that the SBA's regulations require that an employee of the 8(a) concern be designated as the project manager. 13 C.F.R. § 124.513(c)(2).

expressly linked just two employees to Sylvain, rather than three, and one of those—the Instructional Designer—had previously been sourced to Entereza. See id. Tab 43 at 979. Compared to the equivalent section in the approved JV agreement, these revisions obscured Senter's employment structure, rather than making it clearer that Senter itself would not employ any individuals performing substantive work on the contract.

As noted above, in the September 22, 2017 denial letter, the SBA gave several reasons for finding that Senter had failed to establish that it was an unpopulated JV, including that "[t]he initial joint venture approved by SBA on September 1, 2016 was Populated"; that "the [a]ddendum . . . did not adequately describe the sub-contracting vehicle that will split performance between the entity members"; and that "[d]ue to discrepancies and lack of supporting documents," the addendum was "not legally sufficient." See id. Tab 35C at 839 (emphasis omitted). Senter takes issue with the first of these, arguing that the SBA in fact approved an unpopulated JV agreement in September 2016, not a populated one. See Mot. for J. on the Admin. R. (Pl.'s Mot.) ¶¶ 7, 20, ECF No. 24.

The record, however, does not provide the Court with any definitive insight into what (if anything) the SBA concluded about Senter's status as populated or unpopulated when it approved the JV agreement. Thus, as noted, the September 1, 2016 approval recommendation does not mention whether Senter is populated or unpopulated. AR Tab 38 at 880–83. And the record lacks any contemporary correspondence between Senter and the SBA regarding the reasons why Senter submitted the revised JV agreement and then the approved JV agreement in the run-up to the SBA's approval.

Senter's argument thus relies mainly on Ms. Mannion's October 12, 2017 email stating that the SBA's D.C. office "ha[d] a[n] unpopulated joint venture" on file for Senter. See Pl.'s Mot. ¶ 5 (citing AR Tab 39 at 884–85). But this later-in-time document neither directly sheds light on the SBA's thinking in September 2016, when it approved the JV agreement, nor accounts for the changes made by the revised addendum, which amended and revised the approved JV agreement. And even assuming that the D.C. office approved the JV as unpopulated, the SBA was not foreclosed from revisiting that determination at a later date, particularly given that the record before it now included the addendum.

Finally, and in any event, the other rationales articulated in the denial decision—that the addendum "did not adequately describe the sub-contracting vehicle that will split performance between the entity members," and that "[d]ue to discrepancies and lack of supporting documents" the addendum was "not legally sufficient"—are thoroughly supported by the record. See AR Tab 35C at 839 (emphasis omitted). These grounds alone provide sufficient reason to uphold the SBA's denial decision, and Senter challenges them only obliquely. Thus, it claims that the "Court has not been presented with any evidence of the standards used by the SBA in determining the insufficiency of the addendum." Pl.'s Mot. ¶ 19.

The SBA's regulations (with which Senter is presumed to be familiar), however, provide detailed guidance on the information that must be included in a JV agreement

and on the issue of differentiating an unpopulated JV from a populated one. See 13 C.F.R. § 125.8(b) (discussing the contents of a joint venture agreement); id. § 121.103(h) (describing the difference between populated and unpopulated joint ventures). And it is clear on the addendum's face that it is intended to "amend and revise" the existing JV agreement. See AR Tab 43 at 978. Further, any 8(a) contractor should be aware of the general rule that it must establish its eligibility as of the date of the submission of its initial offer. See FAR 19.805-2(b). Senter was therefore in a position to know that when the SBA assessed the addendum, it would necessarily have to ensure that the agreement, as amended and revised by the addendum, met the SBA's standards for program eligibility, including the requirement that the JV be unpopulated.[10]

In summary, the Court concludes that the SBA's determination that Senter did not show that it was eligible for the award had a rational basis in the record. Accordingly, the Court must uphold the SBA's eligibility determination.

## CONCLUSION

For the reasons discussed above, Senter's motion for judgment on the administrative record is **DENIED** and the government's cross-motion for judgment on the administrative record is **GRANTED**. The Clerk shall enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

[10] In its reply brief, Senter also contends that pursuant to FAR 15.306(d)(3), the SBA had a duty to inform Senter that it "was in the process of determining whether Senter was a populated or unpopulated joint venture" when it evaluated the addendum. Pl.'s Resp. to Def.'s Cross Mot. for Summ. J. Upon the Admin. R. & Reply to Pl.'s Mot. for J. Upon the Admin. R. at 5, ECF No. 32. Senter did not raise this argument in its opening brief, and it is therefore waived. See Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 708 (2011) ("[A] party waives issues not raised in its opening brief."). And the claim lacks merit in any event because this is not a FAR Part 15 procurement and because the SBA's correspondence with Senter regarding its eligibility does not constitute a communication or discussion with the contracting officer about the merits of Senter's proposal. See FAR 15.306(d)(3) (concerning discussions with the contracting officer about a proposal's strengths and weaknesses).